# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Leonard F. Joy
*Executive Director*

*Southern District of New York*
John J. Byrnes
*Attorney-in-Charge*

March 14, 2008

**BY HAND & ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street, Room 1310
New York, New York 10007

  Re: **United States v. Kenny Rivera**
     **07 Cr. 918 (LAK)**

Dear Judge Kaplan:

  I submit this sentencing memorandum on behalf of my client, Kenny Rivera, in advance of his sentencing, which is scheduled for March 28, 2008 at 10 A.M. On December 10, 2007, Mr. Rivera pled guilty to illegally reentering the United States following his 2003 deportation to the Dominican Republic in violation of 8 U.S.C. § 1326(a) and (b)(1). For the reasons outlined below, including an error made at Mr. Rivera's 2000 sentencing, his difficult background and his strong commitment to his family, I respectfully urge the Court to sentence Mr. Rivera to a period of approximately six months time-served.[1] Such a sentence would be sufficient, but not greater than necessary to meet each of the statutory objectives of sentencing: punishment, deterrence, and rehabilitation.

**I. Background**

  Kenny Rivera was born in the Dominican Republic on January 17, 1968. See Pre-Sentence Investigation Report (the "PSR") ¶ 40. He was the third of seven children born to Sixto Rivera-Cruz and Luisa Rivera. In 1975, when Mr. Rivera was only seven years old, his mother died of cancer after a long and painful illness. Id. ¶¶ 40, 41. As a result, Mr. Rivera's oldest sister took over responsibility for the other children, until she herself married at age 15. After that, Mr. Rivera's father married Luciana Rivera-Sanchez, who moved in with the family when Mr. Rivera was about nine years old. Id. ¶ 41.

---

[1] In the amended PSR, the Department of Probation indicates that it has concluded that Mr. Rivera's Guidelines range is 57-71 months. For the reasons discussed in Section III below, the defense believes that Probation's analysis is inaccurate and that Mr. Rivera's Guidelines range is actually 15-21 months.

Honorable Lewis A. Kaplan  March 14, 2008
United States District Judge  Page 2
Southern District of New York

    Re:    **United States v. Kenny Rivera**
              **07 Cr. 918 (LAK)**

Mr. Rivera's father worked as a farmer to support the family. Id. He had his own small plot of land in LaGuarna, a rural area outside of San Francisco de Macoris.[2] Because the family's plot was so small, Mr. Rivera's father also worked on other farms between 8 A.M. and 3 P.M. to earn additional money. For as long as he can remember, Mr. Rivera was expected to help out on the farm, performing a wide variety of tasks.

Despite their hard work, the family barely earned enough for survival. Id. At times they had enough to eat, but other times they would not have sufficient food for weeks at a time. Things were so tight that Mr. Rivera did not get his first pair of shoes until he was fifteen years old. Each of the children only had one shirt to wear at a time.

In addition, because of the demands of the farm, Mr. Rivera had little opportunity to pursue an education. He did go to school until the eighth grade, attending classes during the morning session from 8 A.M. to 12 P.M. After he came home, he was expected to work several hours on the farm with his older brother. Id. ¶ 52. After the eighth grade, however, his father decided to keep him home to work on the farm full-time. The school was an hour and a half walk away, and in any event, his father could no longer afford to buy the schoolbooks. Id. Mr. Rivera loved school and counts himself lucky to have been able to go that far, as most of his siblings were not given the same opportunity and dropped out even earlier.

When Mr. Rivera was about fourteen years old, he was sent to work on other people's farms to earn extra money for the family. Like his father and older brother, he performed back-bending labor from 8 A.M. to 3 P.M. every day. Initially, he earned about 5 pesos a day, but this later went up to 12 pesos a day, as he grew physically stronger. Even at the higher rate, he was earning the equivalent of about 50 cents a day for his work. Despite these efforts, the family still was not earning enough to survive and often went hungry.

In approximately 1990, when Mr. Rivera was twenty-two years old, he decided to come to the United States to pursue better economic opportunities for his family. Id. ¶ 42. He made the hazardous trip by boat from the Dominican Republic to Puerto Rico. In order to help pay for his trip (about $200 at the time), Mr. Rivera's father mortgaged the family house and plot of land. This made Mr. Rivera feel even more responsible for ensuring that he earned enough money to send back home to his family. After spending some time in Puerto Rico, Mr. Rivera

---

    [2]    The PSR notes that Mr. Rivera told Probation that he was born in Santo Domingo, but that a previous PSR had indicated he was born in San Francisco de Macoris. See PSR ¶ 40. When Mr. Rivera referred to Santo Domingo in the interview, he was referring to the Dominican Republic generally, as is common practice in rural areas in that country.

Honorable Lewis A. Kaplan  March 14, 2008
United States District Judge  Page 3
Southern District of New York

Re:  **United States v. Kenny Rivera**
     **07 Cr. 918 (LAK)**

moved to New York in search of employment. Over the next several years, he worked variously in a barbershop, in a grocery store, and as a sidewalk flower vendor, sending home all the money that he could save.

In 1994, Mr. Rivera fell on difficult financial times. The police began to crack down on illegal vendors in his neighborhood, and Mr. Rivera did not have the proper license for selling flowers. Whenever the police found him selling flowers, they would confiscate his inventory, which he had purchased from his own pocket. Before long, Mr. Rivera's flower business was totally destroyed. It was during this desperate time that Mr. Rivera sustained his 1994 conviction for the possession of drugs. Id. ¶ 26.

As a result of his conviction, Mr. Rivera was deported back to the Dominican Republic in 1997. He returned to LaGuarna to live with his family and stayed there for the next three years. He started a fruit business and was eventually able to earn about 20 pesos a day. At the same time, he was involved in a relationship with Teresita Rodriguez, and they had a daughter together in September 1998. Id. ¶ 45. Although Mr. Rivera and Ms. Rivera-Sanchez did not remain together, Mr. Rivera did his very best to support their daughter. At times, however, he did not earn enough to buy sufficient milk for the baby, as milk was particularly expensive at the time.

In 1999, Mr. Rivera returned to the United States, again motivated by the financial pressures that he was facing. Id. ¶ 42. This was in part because his father's crops had been ruined when a nearby river flooded, causing great hardship for the family. Id. Mr. Rivera had been back in New York for only a short time when he was arrested in an immigration round-up and charged with illegal reentry in the Southern District of New York. Id. ¶ 32. He was deported once again in March 2003 and returned to his family. Id. Back in the Dominican Republic, he worked as a day laborer at a rice farm. He also rented a motorcycle, which he used as a taxi to earn extra money.

II.  **Offense Conduct**

Regrettably, Mr. Rivera decided to try to come to the United States one more time in late 2006. Id. ¶ 43. One of his half-brothers, Juan Rivera, had recently moved to the United States and Mr. Rivera knew that he could stay with Juan while he tried to get on his feet. He decided to come back, because his family was still struggling to survive financially. Despite the great risk, Mr. Rivera knew that he would be able to help his family much more if he could get a job in the United States. His half-brother Juan was working at a live poultry store and was not earning enough to send a significant amount back.

Honorable Lewis A. Kaplan  March 14, 2008
United States District Judge  Page 4
Southern District of New York

  Re: **United States v. Kenny Rivera**
     **07 Cr. 918 (LAK)**

  Shortly after his return to the United States, Mr. Rivera was unfortunately arrested again by the New York City Police Department on January 11, 2007. Id. ¶ 36. He was remanded and pled guilty to drug possession in New York State court on February 16, 2007. Id. He received an eleven month sentence, which was completed on August 22, 2007.[3] He was subsequently taken into immigration custody, where he remained for approximately one and a half months.

  On October 2, 2007, Mr. Rivera was brought into federal custody and presented before the Honorable Ronald L. Ellis. On December 10, 2007, Mr. Rivera pled guilty to illegally reentering the United States following his 2003 deportation to the Dominican Republic in violation of 8 U.S.C. § 1326(a) and (b)(1). He pled guilty pursuant to an October 12, 2007 Pimentel letter that calculated his Guidelines range as 10-16 months imprisonment, based on an adjusted offense level of 10 and Criminal History Category III.

**III.** **Objections to Guidelines Calculation**

  In the draft PSR, the Department of Probation came to the conclusion that Mr. Rivera's Guidelines range was 15-21 months, based on an adjusted offense level of 10 and Criminal History Category IV. See Draft PSR ¶ 58. Probation determined that Mr. Rivera's Criminal History Category was IV (not III as in the Pimentel), because the Government had neglected to include three points for Mr. Rivera's 1999 illegal reentry conviction. Then, without notice to defense counsel, Probation abruptly revised its Guidelines calculation in the amended PSR, which was disclosed on March 6, 2008. In the amended PSR, Probation took the position that Mr. Rivera's Guidelines range was actually 57-71 months, based on the theory that Mr. Rivera's 1994 drug conviction was for a drug trafficking offense (meriting a 16 level enhancement under § 2L1.2(b)(1)(A)), rather than for a drug possession offense (meriting a 4 level enhancement under § 2L1.2(b)(1)(D)). See PSR at p. 13. In this, Probation apparently relied on the fact that the 2000 PSR in Mr. Rivera's prior illegal reentry case applied a 16-level enhancement. Id. (An excerpt of the 2000 PSR, showing the 2000 Guidelines calculation, is attached as Exhibit A).

  As established in the accompanying documents, however, Mr. Rivera's 1994 conviction was for drug possession, not for drug trafficking. Mr. Rivera pled guilty to a 1994 Information in the Supreme Court of New York that charged him with the "Criminal Possession of a Controlled Substance in the Third Degree, in violation of Penal Law Section 220.16(12)." See Exhibit B. Specifically, Mr. Rivera was charged with possessing a mixture or compound containing cocaine that weighed one-half ounce or more. Id. For the convenience of the Court, I have attached New

---

  [3] The defense obtained the sentence-completion date in a March 13, 2008 call with the New York City Department of Correction.

York Penal Law Section 220.16, which demonstrates that subsection (12) covers possession, and not sale. See Exhibit C.

Accordingly, Mr. Rivera's Guidelines range is properly 15-21 months, as stated in the original draft of the PSR. The 2000 PSR contained a higher Guidelines Range (46-57 months), because Probation concluded at that time that Mr. Rivera's 1994 drug possession conviction qualified as an "aggravated felony."[4] At the time, an "aggravated felony" was enough to trigger the 16-level enhancement under § 2L1.2(b)(1)(A). The United States Supreme Court has since made clear in Lopez v. Gonzalez, 127 S.Ct. 625 (2006), however, that drug possession does not count as an "aggravated felony" for the purposes of the Immigration and Nationality Act.[5] Id. at 633. Thus, as discussed below, Mr. Rivera in all likelihood received significantly more time as a result of his prior illegal reentry than he would have received if the 2000 PSR had calculated his Guidelines range correctly. Under Supreme Court precedent, the Lopez decision applies retroactively, because the decision narrowed the scope of a criminal statute by interpreting its terms. See Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004); Bousley v. United States, 523 U.S. 614, 620-21 (1998).

## IV. Sentencing Analysis

### A. *United States v. Booker* and the New Sentencing Regime

As this Court is well aware, the Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005), substantially altered a district court's obligations with respect to its sentencing decisions. Before Booker, a sentencing court – absent extraordinary circumstances warranting departure – was required to impose a sentence consistent with the range contemplated by the Sentencing Guidelines. Now, the Guidelines range is just one of several factors set forth in 18 U.S.C. § 3553(a) that a sentencing court is to consider in determining the appropriate sentence. See Booker, 543 U.S. at 245-46; see also Gall v. United States, 552 U.S. __, 2007 WL 4292116, at * 12 (December 10, 2007) (emphasizing that "the Guidelines are only one of the factors to consider when imposing sentence"); United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005)

---

[4] The 2000 PSR relied on the 1998 version of the Guidelines.

[5] Both the 1998 and 2007 versions of the Guidelines section on illegal reentry define "aggravated felony" within the meaning of the Immigration and Nationality Act. See 1998 Sentencing Guidelines, § 2L1.2, Application Note 1; 2007 Sentencing Guidelines § 2L1.2, Application Note 3(A).

Honorable Lewis A. Kaplan  March 14, 2008
United States District Judge  Page 6
Southern District of New York

    Re: **United States v. Kenny Rivera**
         **07 Cr. 918 (LAK)**

("Now, with the mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to 'consider' numerous factors acquires renewed significance.").

    In each individual case before it, the sentencing court must consider all of the § 3553(a) factors in determining what would be an appropriate sentence. Although the "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the sentencing court "may not presume that the Guidelines range is reasonable." Gall, 2007 WL 4292116, at * 7. Instead, the court must make an "individualized assessment" based on all the facts presented. Id. The court may impose a non-Guidelines sentence in light of the other § 3553(a) factors, and it may vary a sentence from the Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." Kimbrough v. United States, 552 U.S. __, 2007 WL 4292040, * 12 (December 10, 2007). On appeal, moreover, no presumption of reasonableness attaches to the sentencing range calculated by the Guidelines. See United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006) ("We . . . decline to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable.").[6]

    Section 3553(a) directs the Court to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) makes clear that these purposes are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

---

    [6] The United States Supreme Court has emphasized that "appellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" Gall, 2007 WL 4292116, at * 6. Although appellate courts may consider the extent of a deviation from the Guidelines, the Supreme Court has recently rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." Id. The Court has also rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Id.

Honorable Lewis A. Kaplan  
United States District Judge  
Southern District of New York

March 14, 2008  
Page 7

Re: **United States v. Kenny Rivera**  
**07 Cr. 918 (LAK)**

18 U.S.C. § 3553(a)(2).

The sentencing court is also directed to consider six additional factors: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the kinds of sentences and the sentencing range established in the Sentencing Guidelines; (4) the policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (6) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

**B.     Application of Section 3553(a) Factors**

As noted, the Sentencing Guidelines are now just one of several factors the Court must consider in determining what sentence is "sufficient, but not greater then necessary." 18 U.S.C. § 3553(a). We respectfully submit that an analysis of the § 3553(a) factors supports a sentence of time-served in this case. We ask that the Court consider these factors – along with its own sense of what would constitute a fair and just sentence – in determining the appropriate sentence for Mr. Rivera. See United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006) (noting that a sentencing judge may consider his or her own sense of what would constitute a fair and just sentence under all the circumstances, so long as all of the 3553(a) factors are taken into account).

First, we ask the Court to consider that Mr. Rivera's Guidelines range at his 2000 sentencing for illegal reentry was considerably overstated. See Section III. Indeed, if his Guidelines range had been properly calculated, it appears that Mr. Rivera's Guidelines range would have been 10-16 months, based on an adjusted offense level of 10 and Criminal History Category III. Instead, his Guidelines range was calculated as 46-57 months, based on an adjusted offense level of 21 and Criminal History Category III. As a result of the inaccurate calculation, Mr. Rivera was sentenced to 46 months in prison, the bottom of the erroneous Guidelines range. The defense respectfully submits that this is a significant factor that should be considered in the interests of justice under § 3553(a).

Second, Mr. Rivera grew up in difficult circumstances with very few opportunities for advancement. His family was so poor that they often did not have enough to eat. Although Mr. Rivera did well in school, he could not continue his education after the eighth grade, because his father needed him to work to earn money. Despite all of their efforts, the family continued to suffer through periods of great financial hardship.

Honorable Lewis A. Kaplan  March 14, 2008
United States District Judge  Page 8
Southern District of New York

Re: **United States v. Kenny Rivera**
    **07 Cr. 918 (LAK)**

      Third, Mr. Rivera came back to the United States again, because of his strong desire to help his family. His previous trip to the United States had been so brief that he had not had time to find a job to send money back home. After about three years back in the Dominican Republic, he had decided to try again, as his half-brother Juan had recently moved to New York and he knew he would have a place to stay. See Exhibit D (letter from Juan, describing Mr. Rivera's devotion to his family). Mr. Rivera came to the United States in late 2006, because his family was going through hard economic times and he knew he could be of great help to them if he could find a job in New York. Once again, however, Mr. Rivera was arrested almost immediately after his return.

      Fourth, despite his previous reentry conviction, Mr. Rivera has no intention of ever coming back to the United States again. His father, with whom he has always been extremely close, died in February 2007, while he was in state custody. The fact that he could not attend his father's funeral was extremely painful for Mr. Rivera. He also realizes that he has hurt his family much more than he helped them by returning to the United States. Once he is deported to the Dominican Republic, he is determined to do all he can to build a stable life there and to focus on the daily tasks of raising his daughter.

      Fifth, I ask the Court to consider the approximate month and a half that Mr. Rivera spent in immigration custody before he was brought into federal custody and charged with illegal reentry. Mr. Rivera will not be credited for this time by the Bureau of Prisons. I also ask that the Court consider the time that Mr. Rivera will likely be detained in immigration custody before he is deported to the Dominican Republic. Time in immigration custody is if anything, even more difficult, given the condition of the detention centers. Because of his illegal status, moreover, Mr. Rivera will not be eligible to serve the last part of his sentence in a half-way house.

## V. Conclusion

      Mr. Rivera is a devoted family man who returned to the United States in the hopes that he could better support his family, including his minor daughter. He made a terrible mistake in returning to this country, and he takes full responsibility for his actions. Given all of the circumstances of his case, as discussed in detail above, a sentence of approximately six months

Honorable Lewis A. Kaplan  
United States District Judge  
Southern District of New York

March 14, 2008  
Page 9

Re: **United States v. Kenny Rivera**  
07 Cr. 918 (LAK)

time-served would be "sufficient but not greater than necessary" to achieve the purposes of sentencing in this case.

Respectfully submitted,

*Fiona Doherty*

Fiona Doherty  
Attorney for **Kenny Rivera**  
Tel: (212) 417-8734

cc: Christian R. Everdell, Esq.  
Assistant United States Attorney (by hand)

Thomas J. McCarthy  
Senior United States Probation Officer (by hand)

Kenny Rivera  
MDC - Reg. No. 48292-054 (by United States mail)